## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00457 (CRC)** |
| **v.** | : | |
| | : | |
| **ANTHONY SCIRICA,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Anthony Scirica to 15 days' imprisonment and $500 in restitution.

### I.      Introduction

The defendant, Anthony Scirica, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Anthony Scirica pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating and Picketing in the Capitol Building. For the reasons set forth below, the government recommends a sentence of 15 days' imprisonment  and $500 in restitution.  A sentence that includes jail time is appropriate in this case for many reasons, however the most relevant aggravating factors are as follows.  First, Scirica did not merely follow others once inside the Capitol Building, he *led* rioters through Statuary Hall in the direction of the House Chamber doors because he thought "that must be the place towards where the electors are so I went that way." *See*

Exhibit 1, defendant interview at 12:05 – 12:37.  In a video Scirica took with his cell phone, Scirica appears to be leaving the Rotunda when he directs the crowd and says, "through there!" pointing in the direction of Statuary Hall.  *See* Exhibit 3.  Second, once he arrived in the hallway leading to the House Chamber doors, he and other rioters were met with a line of law enforcement officers.  Scirica, standing near the front of the line, immediately began to chant, "USA," and shortly thereafter observed violence as rioters pushed against police officers until the line broke.  *See* Exhibit 4.  Third, Scirica has shown no remorse for his conduct.  Specifically, when asked by the FBI agent whether looking back he wished he had remained outside the Capitol, Scirica responded in a flat tone, "I don't know.  I'm not really sure.  It might make a good story in like 50 years when I am a grandfather."  *See* Exhibit 2, defendant interview at 22:50 – 23:35.  Finally, despite hearing what he believed to be a window breaking, and observing a broken window, he entered the Capitol Building while alarms were going off inside, and remained there for a total of 31 minutes, despite the violence he observed.

Even if he did not personally engage in violence or property destruction during the riot, before entering the Capitol on January 6, Scirica encouraged and celebrated the violence of that day when he decided to continue advancing with the crowd and proudly documenting his participation by taking continuous photos and videos.  *See* Exhibits 3, 7, and 10-14.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Despite the fact that Scirica submitted to a voluntary interview with the FBI, which occurred post-arrest but pre-guilty plea, and provided videos he had recorded on his cell phone during January 6th to the FBI, his brazen

conduct merits a short term of incarceration.  Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the fact that he could have, but chose not to, separate from the other rioters and instead entered and led a crowd of rioters deeper into the Capitol and remained inside despite witnessing violence and destruction, and his lack of remorse, renders a short term of imprisonment both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 17 (Statement of Offense), at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Anthony Scirica's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Anthony Scirica traveled to Washington, D.C. from his home in North Carolina to attend the "Stop the Steal" rally.  After attending the former President's rally, Scirica walked to the U.S. Capitol along with a group of other individuals.  As he approached the Capitol, he saw people on the steps and on the scaffolding outside of the Capitol.  He saw a large crowd in front of him, and he decided to push his way to the front to see what was happening.

He watched as other individuals entered the Capitol.  Although he knew he did not have permission to enter the Capitol, he told the FBI that he decided that he wanted to see it for himself and see what was happening with his own eyes.  *See* Exhibits 1 and 2, defendant interview.  As he admitted during an interview with the FBI, he heard people yelling and shouting, he heard what

he believed to be a window breaking, and he heard alarms going off inside the Capitol, yet he decided to enter anyway.  *Id*.

At approximately 2:24 p.m., Scirica entered the Capitol through the Senate Wing door. Because the first breach of the Capitol Building occurred through a window next to the Senate Wing door at approximately 2:13 p.m., Scirica's 2:24 p.m. entry makes him one of the early rioters to enter the building. While inside the Capitol, Scirica walked through the Rotunda at approximately 2:26 p.m., and proceeded through Statuary Hall at approximately 2:27 p.m.  Video of Scirica inside the Capitol illustrates that he was not a mere follower but instead anointed himself as leader to a group of rioters inside the Capitol.  *See* Exhibits 3 and 4.  Scirica directed a group of rioters who were seemingly lost and walking away from the House Chamber doors, instead through Statuary Hall and directly to a police line outside the House Chamber.  In fact, he documented his efforts on his cell phone in a video in which he appears to be leaving the Rotunda, and directs the crowd by saying, "through there!" and pointing in the direction of Statuary Hall.  *See* Exhibit 3. In doing so, Scirica encouraged others to travel deeper into the Capitol with him, and in fact they did so.  *See* Exhibit 4, CCTV footage.  Below is a screenshot from this CCTV footage.  Behind Scirica is Statuary Hall and ahead of him is the House Chamber.



Scirica encountered a line of police officers blocking passage to the House Chamber, where members of Congress were still inside. Scirica immediately began to chant, "USA, USA," at the police, as seen in the screenshot below.



The below screenshot from CCTV shows the crowd of rioters that Scirica led through Statuary Hall, and that quickly formed around him, at approximately 2:29 p.m.   The House Chambers was evacuated at approximately 2:30 p.m.



Approximately 7 minutes later, the police line seen in the above photograph broke when rioters pushed their way through the line and continued to the House Chamber doors.  *See* Exhibits 5 and 15.  A map of the second floor of the Capitol below shows the location of the police line (marked with a red dot) and the location of the House Chamber doors (marked with a blue dot) and shows that Scirica led rioters in the direction of the House Chamber.



Although the government does not have video showing Scirica pushing against the line of police, he was only a few individuals back from the front of the police line when it broke. *See* Exhibits 4, 5, and 15. Scirica proceeded forward with the other rioters to the House Chamber doors. Scirica's cell phone contains a video showing that Scirica stood close to the House Chamber doors (marked above with a blue dot) as rioters banged on it. *See* Exhibit 7. A screenshot from this video is below.



Video obtained from open-source shows that despite tear gas being detonated into the crowd near the House Chamber doors in order to clear the rioters out, Scirica remained in the area, undeterred.  *See* Exhibit 8.  Below is a screenshot of Exhibit 8, which shows Scirica in the location of the red dot on the map above, in a cloud of tear gas.



Scirica then proceeded around the corner to where the green dot appears on the map above. *See* Exhibit 9.  Below is a screenshot of Scirica standing in a doorway leading in the direction of the Speaker's Lobby.  He lingered in this doorway for approximately 5 minutes while police were attempting to clear the area, before finally exiting the building through the East Rotunda doors.



The above screenshot occurred at approximately 2:49 p.m., 5 minutes after Ashli Babbitt was shot nearby in the Speaker's Lobby, and when police officers were attempted to clear the area.

Scirica took several videos on his phone that showed the chaos unfolding around him and the crowd's defiance against law enforcement while inside Capitol. While inside the Capitol, it is clear that Scirica saw law enforcement officers attempting to prevent the rioters from advancing inside the Capitol – through use of police lines and the detonation of tear gas – but remained inside the Capitol. In two videos, Scirica filmed the crowd inside the Capitol within mere feet of law enforcement officers. *See* Exhibits 10 and 11. He admitted in his interview with the FBI to seeing a man push a law enforcement officer inside the Capitol (which was likely referring to when the police line broke outside the House Chamber doors), and to a man telling Scirica that he had a gun, but neither of those observations caused the defendant to stop moving through the Capitol.

In total, Scirica spent approximately 31 minutes inside the Capitol.   He admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so and expressed zero remorse for that decision.

*Anthony Scirica's Interview*

Scirica voluntarily agreed to an interview with the FBI in the presence of defense counsel. *See* Exhibits 1 and 2.  Scirica told the FBI that he had been inside the Capitol Building for about 20 minutes.   In reality, Scirica was in the building for 31 minutes, as confirmed by Capitol surveillance cameras.   Aside from that, Scirica appeared to be truthful and forthcoming, yet displayed an air of complete indifference and expressed no remorse.   During the interview, he recounted his activities on January 6.  He admitted that outside the Capitol he heard aggressive shouting, and as he got closer, he heard a window breaking and an alarm going off.   He entered the Capitol anyway.  He said that he walked through the Capitol and went in the direction of where he thought the "electors" were located.  He said that he saw law enforcement officers in the Capitol near where he thought the electors were located.  He also said that he witnessed people pushing against police officers.  He said that while he was inside the Capitol, one of his fellow rioters informed Scirica that he had a gun.  Specifically, when asked by the FBI agent whether looking back he wished he remained outside the Capitol, Scirica said, "I don't know.  I'm not really sure. It might make a good story in like 50 years when I am a grandfather."

*The Charges and Plea Agreement*

On June 14, 2021, Anthony Scirica was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On July 8, 2021, Anthony Scirica was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).   On September 28, 2021, he pleaded guilty to Count Four of the

Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, and Picketing in the Capitol Building.  By plea agreement, Scirica agreed to pay $500 in restitution to the Department of the Treasury.

### III.   Statutory Penalties

The defendant now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.[1]  The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors except for the defendant's lack of criminal history and cooperation with law enforcement (after arrest, but before pleading guilty) weigh in favor of a brief sentence of incarceration.

---

[1] Because defendant has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. §§ 19, 3583(b)(3).

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.

Additionally, while looking at the defendant's individual conduct, the Court assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.  Here, as discussed below, many of those factors are aggravating.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct.  The absence of

violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Anthony Scirica's conduct merits a short term of imprisonment. As a preliminary matter, Scirica understood that the Certification was taking place inside the Capitol Building on January 6. As stipulated to in the Statement of Offense attached to Scirica's plea agreement, earlier in the day, Scirica attended the Stop the Steal rally. *See* ECF 17. In one of his own cell phone videos, Scirica can be heard yelling "Stop the Steal!" *See* Exhibit 12. When others marched toward the Capitol, he decided to join them. Scirica observed the large crowd gathered outside the Capitol and on the stairs and he heard aggressive shouting. In another of his cell phone videos, Scirica filmed a large crowd on the steps of the Capitol. *See* Exhibit 13. In another video, he climbed the steps to the Upper West Terrace where we can hear an individual – possibly Scirica himself – yelling "our house!" and "let's go!" *See* Exhibit 14. And when he saw others enter the building, he decided that he wanted to enter too even though he knew he was not permitted to do so.

Scirica entered the building at approximately 2:24 p.m. through the Senate Wing doors approximately 11 minutes after the initial breach. While no police officers blocked his path, there were clear signs of violent entry. The window adjacent to the door through which Scirica passed had just been smashed out, and Scirica filmed this destruction with his phone. *See* Exhibit 6. He would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. Indeed, Scirica admitted to and his cell phone video shows that he saw the broken window and heard the alarms sounding even before he entered the Capitol. *Id*.

Scirica had every opportunity while inside the Capitol to turn around and exit, yet he did not. He traveled deeper and deeper into the Capitol and in the direction of where – as he chillingly

admitted in his interview – he thought the "electors" were located.  *See* Exhibit 1.  Yet, he did not leave.  Instead, he documented everything on his cell phone, including a video of an angry crowd shouting and banging on the locked doors to the House Chamber.  *See* Exhibit 7.  He also admitted that he observed others pushing against law enforcement officials. Despite witnessing chaos and violence, Scirica was undeterred and remained inside the Capitol.  Moreover, Scirica's statement after January 6 when he was interviewed by the FBI shows a complete lack of remorse.  To Scirica, this is a good story for the grandkids.

Scirica was one of the early rioters to enter the Capitol building, where he observed the violence and destruction first-hand, and nevertheless chose to enter the Capitol and to lead rioters deeper into the Capitol and towards the House Chamber doors.  He proudly documented his time on numerous videos on his phone.   On top of that, his post January 6 statement indicates absolutely no remorse.  A sentence of 15 days' incarceration is warranted.

**B.  The History and Characteristics of the Defendant**

The government is not aware of Scirica having an association with any extremist groups or engaging in any other criminal conduct.

The government also notes that Scirica expressed an interest in pleading guilty early and acknowledged his conduct in an interview with the FBI.  When recommending this sentence, the government gives credit to a defendant's early resolution of a case.

**C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[2]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Anthony Scirica's conduct on January 6 and his post-January 6 statement clearly demonstrates the need for specific deterrence for this defendant.  On numerous occasions, Scirica had the opportunity to turn around when he witnessed destruction and violence, yet he did not. Scirica remained undeterred from the moment he decided to enter the Capitol and continued to remain undeterred as he marched deeper into the Capitol and even led a crowd of rioters in the direction of the House Chamber doors because, in his own words, he thought "that must be the place towards where the electors are so I went that way."  *See* Exhibit 2.

As of the date of this filing, Scirica has not expressed any remorse.  When interviewed by the FBI and asked whether looking back he wished he stayed outside, Scirica said "I don't know" and stated that it would be a good story in 50 years when he is a grandfather.  *Id.*  The government acknowledges that the defendant accepted responsibility early by entering into this plea agreement. On the other hand, the defendant's failure to acknowledge the dangers and violence of January 6,

2021, and his lack of remorse underscore the need for specific deterrence in this case.  As Judge
Chutkan stated at the sentencing hearing of Matthew Carl Mazzocco, "Ms. Ward's statement that
he accepted early responsibility.  But Mr. Mazzocco's remorse -- and I believe his remorse is
sincere -- Mr. Mazzocco's remorse didn't come when he left that Capitol.  It didn't come when he
went home.  It came when he realized he was in trouble.  It came when he realized that large
numbers of Americans and people worldwide were horrified at what happened that day.  It came
when he realized that he could go to jail for what he did.  And that is when he felt remorse, and
that is when he took responsibility for his actions."  *See U.S. v. Matthew Carl Mazzocco* (21-CR-
0054 (TSC), ECF 32 at pp.29-30).  If Scirica chooses to finally express remorse when he is
sentenced, it should be viewed with skepticism in light of his prior statement and the timing of any
such expression.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles
in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as
in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with
Congress.[3]   Each offender must be sentenced based on their individual circumstances, but with
the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum
that ranges from conduct meriting a probationary sentence to crimes necessitating years of
imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum,
but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A

---

[3]  Attached to this supplemental sentencing memorandum is a table providing additional
information about the sentences imposed on other Capitol breach defendants.  That table also
shows that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not become the default.[4]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have made meaningful distinctions between misdemeanor offenders. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).  *See id*.  ("A

---

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").   Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.   *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).   The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.   Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the specific blend of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in *United States v. Bissey* (21-CR-00165-TSC).   In *Bissey*, the defendant saw destruction at the Capitol, was aware she was not supposed to enter the building, stayed in the building for 10 minutes, posted numerous photographs and statements to social media indicating pride in her actions, and cooperated with law enforcement.   In *Bissey*, the defendant received a sentence of 15 days' incarceration.   Scirica's aggravating factors are comparable to Bissey's in number and severity.   Unlike Bissey, Scirica was in the Capitol for more than 31 minutes, lead other rioters through the building and towards the House Chamber doors, and directly interacted with law enforcement.   However, Scirica did not post so prolifically on social media about his exploits.

21

Another sentence that the Court may consider for comparison's sake is the Court's own sentencing in *United States v. Wilkerson* (21-CR-302), where this Court sentenced the defendant to 36 months' probation and 60 hours of community service. Although both Wilkerson and Scirica were amongst the first rioters to enter the building (Wilkerson 8 minutes after the first breach and Scirica 11 minutes), and both observed violence (Wilkerson outside and Scirica inside the Capitol), Scirica's conduct is more severe in that he remained inside the building for 31 minutes and led a crowd deeper inside towards the House Chamber doors, whereas Wilkerson took no leadership role and spent only 14 minutes inside the Capitol. Therefore, a sentence of 15 days' imprisonment would not create any disparities with the sentences previously imposed in the Capitol breach cases.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient

sentence.  Balancing these factors, the government recommends that this Court sentence Anthony

Scirica to 15 days' imprisonment and $500 in restitution.  Such a sentence protects the community,

promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a

consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ *Grace Albinson*
GRACE ALBINSON
NY Bar No. 4952697
Trial Attorney, U.S. Department of Justice
Capitol Riot Detailee
150 M Street, N.E.
Washington, D.C. 20002
Tel: (202) 598-3276
GAlbinson@usa.doj.gov

AMANDA FRETTO LINGWOOD
Assistant United States Attorney
D.C. Bar No. 1018284
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, DC 20530
(202) 252-7268
Amanda.Lingwood@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On January 13, 2022, a copy of the foregoing was served on counsel of record for

the defendant via the Court's Electronic Filing System.

/s/ *Grace Albinson*
GRACE ALBINSON
Trial Attorney
Capitol Riot Detailee
