```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                           Criminal Action No.
 4                   Plaintiff,            1:21-cr-00457-CRC-1
                                           Thursday, January 20, 2022
 5      vs.                                10:04 a.m.

 6      ANTHONY SCIRICA,

 7                   Defendant.
        - - - - - - - - - - - - - - - x
 8

 9      _____

10                 TRANSCRIPT OF SENTENCING HEARING
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
        _____
12      APPEARANCES:

13      For the United States:         GRACE ALBINSON, ESQ.
                                        U.S. DEPARTMENT OF JUSTICE
14                                      Tax Division
                                        150 M Street, N.E.
15                                      Washington, DC 20002
                                        (202) 616-3311
16                                      grace.e.albinson@usdoj.gov

17
        For the Defendant:             MARK A. JONES, ESQ.
18                                      BELL DAVIS PITT
                                        100 N. Cherry Street
19                                      Suite 600
                                        Winston-Salem, NC 27101
20                                      (336) 722-3700
                                        mjones@belldavispitt.com
21

22      Court Reporter:                Lisa A. Moreira, RDR, CRR
                                        Official Court Reporter
23                                      U.S. Courthouse, Room 6718
                                        333 Constitution Avenue, NW
24                                      Washington, DC  20001
                                        (202) 354-3187
25
```

```
1                          P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Your Honor, we're on the
3     record for Criminal Case 21-457, United States of America
4     vs. Anthony Scirica.
5              Counsel, please identify yourselves for the record
6     starting with the government.
7              MS. ALBINSON:  Good morning, Your Honor; Grace
8     Albinson for the United States.
9              THE COURT:  Good morning, Ms. Albinson.
10             MS. ALBINSON:  Good morning.
11             MR. JONES:  Good morning, Your Honor; Mark Jones
12    for Anthony Scirica.  I'm here with Mr. Scirica in Winston-
13    Salem, North Carolina.
14             THE COURT:  Okay.  Good morning, gentlemen.
15             Mr. Scirica, I can see you.  Can you see and hear
16    me okay?
17             THE DEFENDANT:  Yes, sir, I can.
18             THE COURT:  I've granted your motion to appear
19    this morning by video.  Do we still have your consent to
20    appear by video?
21             THE DEFENDANT:  Yes, Your Honor.
22             THE COURT:  And we have someone from probation?
23             THE PROBATION OFFICER:  Good morning, Your Honor;
24    Hana Field with probation.
25             THE COURT:  So the Court has reviewed the
```

1    presentence investigation report, the government's

2    sentencing memo, as well as the electronic exhibits that the

3    government provided to the sentencing memo.

4         Mr. Jones, I did not receive a sentencing memo

5    from you or any other associated material; is that correct?

6         MR. JONES:  That's correct.  Only argument today,

7    sir.

8         THE COURT:  If there are any guests or family

9    members listening in, the Court welcomes everyone.

10        All right.  Let's start with the factual findings

11   in the presentence investigation report.  Any objections to

12   the factual findings with respect to the circumstances of

13   the offense or the defendant's background?

14        MR. JONES:  No, Your Honor.

15        MS. ALBINSON:  No, Your Honor.

16        THE COURT:  Has Mr. Jones reviewed the presentence

17   investigation report with you?

18        THE DEFENDANT:  Yes, sir.

19        THE COURT:  And have you been satisfied with his

20   services in this case so far?

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  Hearing no objections, the Court will

23   accept the factual findings in the presentence investigation

24   report and adopt those facts for purposes of this

25   sentencing.

1            All right.  This is a Class B misdemeanor so the

2     sentencing guidelines do not apply.  The offense of

3     conviction carries a maximum of six months in prison, a

4     period of supervised release of up to two years, I believe,

5     a $5,000 fine, and a $10 special assessment.  Any objections

6     for the record?

7            MR. JONES:  No, Your Honor.

8            MS. ALBINSON:  No, Your Honor.

9            THE COURT:  The government in this case has

10    recommended a sentence of incarceration of 15 days, I

11    believe.  The probation office has made a recommendation of

12    24 months probation and a $500 fine.

13           Ms. Albinson, would you like to address the

14    3553(a) factors as they relate to Mr. Scirica.

15           MS. ALBINSON:  Yes, Your Honor.  Thank you.

16           The government asks that this Honorable Court

17    sentence Anthony Scirica to 15 days imprisonment for the

18    crime he committed on January 6th.  The government

19    understands that 15 days imprisonment is a significant

20    sentence for a misdemeanor crime, but this is not a normal

21    crime and does not merit a normal sentence.

22           The crime that Mr. Scirica committed and the

23    crimes of thousands of other rioters on January 6th were

24    unique and significant to our country's history, and the

25    riot would not have occurred were it not for the actions of

1    thousands of individual rioters, including Mr. Scirica.

2         January 6th was not merely an attack on our

3    nation's Capitol Building, it was an attack that went to the

4    heart of our democracy, to fair democratic elections, and

5    the peaceful transfer of power.  For general and also

6    specific deterrent purposes, it's important to send a

7    message that just because an election does not go your way

8    does not mean that you can violently take over a government

9    building without punishment.  The government is also asking

10   for this significant sentence because of specific

11   aggravating factors that are present for this defendant.

12        First, the defendant entered the Capitol Building

13   through the Senate Wing door shortly after the first breach.

14        Second, the defendant played a leadership role in

15   directing and leading rioters through Statuary Hall in the

16   direction of the House Chamber doors.

17        Third, the defendant observed violence inside the

18   Capitol Building but remained inside and took video with his

19   cell phone.

20        Finally, this defendant expressed no remorse when

21   interviewed by the FBI.

22        Your Honor, this was not just a momentary lapse of

23   judgment or a bad day for this defendant.  His actions were

24   deliberate and controlled on that day.  Mr. Scirica told the

25   FBI that he moved to the front of the crowd outside of the

1    Capitol Building because he, quote, wanted to see what was

2    happening with his own eyes.  And, in fact, Mr. Scirica was

3    one of the early rioters to enter the building.  He entered

4    at 2:24 p.m., 11 minutes after the first breach.

5              Before entering, he admitted to the FBI that he

6    heard people yelling and shouting and alarms going off, a

7    window breaking.  These were clear signs of violence, Your

8    Honor.

9              Here's a video that the defendant took when he

10   entered through the Senate Wing door.  You can see from this

11   video that Mr. Scirica focuses his camera on the broken

12   window that was the site of the first breach of the Capitol,

13   and you can hear yelling and alarms going off.

14             (Pause)

15             THE COURT:  Ms. Albinson, are you sharing your

16   screen with us?

17             MS. ALBINSON:  Yes, one moment, Your Honor.  I

18   apologize.

19             (Audio playing)

20             MS. ALBINSON:  Your Honor, were you able to hear

21   that?

22             THE COURT:  I heard the audio.  I was not able to

23   see the video, but I have reviewed all of the exhibits.

24             MS. ALBINSON:  Okay.  I apologize.

25             Once inside the Capitol, the defendant did not

1    play the role of a mere follower.  Instead, he took it upon

2    himself to lead a large group of rioters through Statuary

3    Hall to just outside the House Chamber doors where they were

4    met with a line of law enforcement officers blocking entry

5    to the House Chamber.

6             Here's a video from the defendant's phone where he

7    directs the crowd to go, quote, through there and points in

8    the direction of Statuary Hall which led to the House

9    Chamber doors.

10            (Audio playing)

11            MS. ALBINSON:  In his own words to the FBI, Your

12   Honor, he led a crowd to where he thought the, quote,

13   electors were located.

14            Once he passed through Statuary Hall and got to

15   the front of the House Chamber doors violence ensued as at

16   that point the crowd pushed through a line of police

17   officers in order to gain access to the House Chamber, which

18   thankfully they were not able to do that day.  Mr. Scirica

19   was feet away from the front of the line as the crowd pushed

20   and broke through the police line to proceed to the House

21   Chamber doors.

22            Instead of leaving after witnessing this violence,

23   Mr. Scirica recorded this video on his phone of rioters

24   banging on the House Chamber doors.

25            (Audio playing)

1      MS. ALBINSON:  Despite seeing violence and tear

2 gas that had been detonated by the police in the area of the

3 House Chamber doors, and despite being near the Speaker's

4 Lobby at the time of the shooting of Ashli Babbitt, the

5 defendant remained inside of the Capitol Building.

6      He has not shown an ounce of remorse for his

7 decisions and actions that day.  That's how we know this

8 wasn't just a bad day.  But what we don't know is whether

9 the defendant will take it upon himself to behave this way

10 again if another election doesn't go his way.

11      A recording of the defendant's interview with the

12 FBI shows the defendant was very unaffected as he spoke

13 about his actions on January 6th.  I'll play a short clip of

14 that interview.

15      (Audio playing)

16      MS. ALBINSON:  I'm sorry.  I wasn't able to get to

17 the point in the video that I wanted to share, but when the

18 defendant is asked about whether or not he regrets his

19 actions on that day, he says he doesn't know, and this could

20 be a good story for the grand kids.

21      For the reasons I've just stated and the reasons

22 in the government's sentencing memo, we respectfully ask

23 this Honorable Court to sentence the defendant to 15 days

24 incarceration.

25      THE COURT:  Okay.  Your recommendation is 15 days

1   incarceration.  Probation has recommended two years of

2   probation.  Those seem to be the two options available to

3   the Court as appropriate to impose in this case.  If you are

4   concerned -- and I will say that the statute, as I read it,

5   does not allow the Court to impose a period of incarceration

6   followed by a period of supervised release as a felony

7   statute or Class A statute or misdemeanor statute would.

8          So given that, and if your concern is what

9   Mr. Scirica might do or, you know, whose call he might heed

10  in the next election, why wouldn't probation, where he was

11  under some form of court supervision, be a more appropriate

12  sentence than a period of incarceration that cannot be

13  followed by supervised release, if you follow me?

14          MS. ALBINSON:  Your Honor, I do believe that a

15  split sentence is allowed on a petty misdemeanor, which is

16  what Mr. Scirica pled guilty to.

17          But to answer your question, I think that this

18  defendant merits jail time not only towards specific

19  deterrent purposes but general deterrent purposes.  A

20  sentence of jail time would send a message to other would-be

21  rioters in future elections that this will not be accepted

22  even if what you do is enter the building and you don't

23  engage in violence yourself.  I think that 15 days jail time

24  will be enough to specifically deter Mr. Scirica as well,

25  even though it does not include monitoring after that time.

1          A jail sentence is a strong message to send to

2     someone, and I believe that that would sufficiently deter

3     Mr. Scirica.

4          THE COURT:  Okay.  Ms. Field, would you mind --

5     can you shed some light on whether the Court would be

6     authorized to order both incarceration followed by a term of

7     supervised release on this offense?

8          THE PROBATION OFFICER:  Your Honor, it was our

9     understanding, because this is a petty offense, that a --

10     and it's a Class B misdemeanor, that a custodial sentence

11     can be ordered but that supervised release is not

12     applicable.

13          It was brought to my attention that -- I believe

14     the interpretation of the statute is subject to legal

15     argument and that we are aware of a couple of cases before

16     this Court where I believe the government has recommended

17     and advocated for the split sentence, for a jail term to be

18     followed by a period of probation.  I don't have any

19     additional information to provide as to any updates on that,

20     but our position is that we would not be recommending this

21     type of split sentence.

22          THE COURT:  Ms. Albinson, anything else?

23          MS. ALBINSON:  No, Your Honor.  Thank you.

24          THE COURT:  Mr. Jones, I'm sorry not to see you in

25     person.  My general philosophy is that if defendants managed

1    to get to Washington last January, then they should be able

2    to manage to get to Washington this January.  I understand

3    there were some extenuating circumstances related to the

4    weather, though, which I understand, so I was glad to grant

5    your motion to appear remotely.

6            MR. JONES:  Thank you, Your Honor.

7            THE DEFENDANT:  Thank you.

8            MR. JONES:  I appreciate that tremendously, and so

9    does Mr. Scirica.

10           I think I'll pick up first with the question the

11   Court asked last, which is about a term of supervised

12   release.  I think the law is very clear that supervised

13   release for a Class B petty offense is not authorized by

14   statute.  The presentence report says that it's not

15   authorized by statute, and we agree to that.  And the

16   government, on Page 13 of its sentencing memorandum, in

17   their footnote says that it's not authorized.  So I'm not

18   sure what's warranting the sudden change of heart, but I

19   think any arguments being put forward now that you can

20   impose supervised release or probation in addition to

21   incarceration on this offense is certainly a novel

22   interpretation, and I would ask the Court to reject it.

23           As to the 3553(a) factors, Your Honor, I believe

24   that the probation office has it right.  You know, I would

25   say that the Court obviously has discretion to do whatever

1    it believes is appropriate in relation to those factors, and

2    just because the government has recommended 15 days doesn't

3    mean that the Court couldn't select a different number of

4    days for an incarceratory term.  So the Court could

5    obviously select five days or ten days or one day.  It's not

6    bound by the government's recommendation or the probation

7    office's recommendation.

8           Nevertheless, Your Honor, we think that the

9    probation office has it correct.  They have looked at the

10   history and characteristics of this defendant, and they are

11   well aware of the nature and circumstances of the offense,

12   which the government did a fine job of pointing out in their

13   sentencing memorandum in their presentation today.

14          But speaking as to how the characteristics of

15   Mr. Scirica interplay with the 3553(a) factors, the things

16   that the presentence report notes that I would highlight

17   about him are that this is his first run-in in any way,

18   shape, or form with the law.  And that doesn't detract from

19   the severity of it or how the Court should address him, but

20   it's not a situation in which we have a serial recidivist.

21   And I think we actually have very low information about his

22   potential for future recidivism.

23          After January of last year, he reenrolled in

24   college and finished his degree at the University of North

25   Carolina.  One thing that is notable -- at least in our

1    district -- about this case is that the FBI made the

2    decision, instead of arresting him, which was common, to

3    reach out to him and to reach out to us, and he turned

4    himself in.  He turned himself in and spent a day in custody

5    in June, and he's been on supervision by our pretrial

6    service officers down here in the Middle District of North

7    Carolina successfully now for about seven or eight months.

8    So we have good reason to think that another period of

9    probation would be completed successfully.

10           He has a strong history of employment and staying

11   busy with lawful pursuits.  When he took a break from

12   college around 2019 and '20, the presentence report notes

13   that he had some mental health issues that were

14   appropriately addressed with counseling, but during that

15   time he worked first at a pet hospital and then for the

16   American Red Cross where he developed some expertise in

17   phlebotomy and apheresis, the separation of the platelets

18   and the plasma.

19           He has, while on pretrial release, found a job,

20   steady employment, with a law firm here in town doing legal

21   work and title work in the Debtor/Creditor Relations Board,

22   and so I have a concern that -- you know, he is an entry-

23   level employee, but that any period of incarceration,

24   particularly one of 15 days or so, would exceed the days of

25   paid time off that he has and very well could result in him

1    losing that employment.

2          The Court has options within the probation context

3    that it can use if it needs or feels that it needs to send a

4    stronger signal to others for the purposes of general

5    deterrence.  The Court can impose inside the probationary

6    term a period of home detention, and were the Court to do

7    that, we would ask only that he be allowed to travel outside

8    of the home for work and then for medical and legal

9    appointments.

10          You know, the Court has options here.  I do

11   believe that his age, his compliance, his -- with pretrial

12   release, his current employment, and his efforts to better

13   himself should be accounted for in the Court.  I believe the

14   probation office did that, took all those things into

15   account and was fully aware of the nature of the offense

16   when it reached its recommendation of 24 months probation.

17          You know, I'll tell the Court -- and I'm sure

18   Mr. Scirica will do the same -- you know, the reason why

19   there's a recording of him talking to the FBI is because

20   from the very beginning he was cooperative and wanted to be

21   as helpful as he could, and he voluntarily sat down and

22   spoke with them even signing a nonattribution agreement

23   which had the curious clause that they could use --

24          THE COURT:  Just to be clear, he did that after

25   the FBI contacted him and went to his house.

1              MR. JONES:  Yes, sir.

2              THE COURT:  He didn't volunteer for that, that he

3      had breached the Capitol, did he?

4              MR. JONES:  Oh, no, that's right.

5              THE COURT:  Yes.

6              MR. JONES:  And the agreement had, you know, an

7      interesting clause in it, which essentially said we will be

8      able to use whatever you say against you, you know, as it

9      has done in this sentencing hearing.

10             But near the end of that he was asked, you know,

11     sort of to reflect on it, and he said, "I think this will

12     make a good story some day."  My take on that, Your Honor,

13     was that it was a failed effort at sardonic humor and one

14     that fell fully flat.

15             But as to the question of what is the amount of

16     just punishment, what is the punishment that will be

17     sufficient but no greater than necessary for this defendant

18     with these characteristics accounting for his role in the

19     conduct, I believe the probation office has it right, that a

20     period of 24 months probation and restitution in the amount

21     recommended by the plea agreement is appropriate, Your

22     Honor.  I would ask the Court to impose that sentence.

23             THE COURT:  Okay.  So address, if you would --

24     you've addressed the government's point regarding lack of

25     remorse.  Address the other aggravating factor that they

1    have emphasized, which is his seemingly leadership role in

2    igniting and encouraging and pointing others towards where

3    he thought the electors might be and being -- you know,

4    being there before a lot of other people, ten minutes after

5    the initial breach.

6         MR. JONES:  Sure.  So the way I tallied them down

7    is the early -- the aggravating factors were that he was in

8    early, that he was near the front of the crowd, that he

9    observed violence, and that his behavior was controlled and

10   measured.

11        I think all of those are explained and were

12   explained to the FBI agent, and what he said is that his

13   intention was to bear witness.  He wanted to see what was

14   going on.  He wanted to be an observer of what was happening

15   in the building that day.

16        His intention -- and I don't think there's any

17   allegation otherwise -- was not to use violence.  It was not

18   to destroy property.  And I know that's accounted for

19   already in the nature of the charge, but it's also important

20   in thinking about his role in the conduct.

21        So yes, he was early in, and yes, when people were

22   standing around the Statuary Hall he did say, you know,

23   "Through there."  The presentence report, though, correctly

24   identifies and notes that he does not have any connections

25   to any group, and so I don't think the Court should believe,

1    when we say "leadership," that it's leadership of people who

2    have, you know, any connection to him.

3           None of the people in any of those videos are

4    known to him.  They're all strangers to him.  They are all

5    people that he has had no -- he just doesn't know.  He was

6    there on his own solely as an individual, and I believe he

7    saw himself there to bear witness as to what was happening.

8    And while he did stay once he saw people pushing and

9    shoving, and he did stay while he saw things that he knew

10   were inappropriate, not once did he engage in any of that

11   conduct, and I think the government has correctly reached

12   the right resolution as to this charge with Mr. Scirica.

13          I don't dispute the facts as they say them.  I

14   don't believe, however, when you balance that as part of the

15   3553(a) factors, that they detract from what I think is the

16   correct result here, which is the one identified by the

17   probation office in this case.

18              THE COURT:  Okay.

19          All right.  Mr. Scirica, anything you want to tell

20   me before I impose sentence?

21              MR. JONES:  You can take your mask off.

22              THE COURT:  Let's just have a conversation, okay?

23              THE DEFENDANT:  Yes, sir.  Sorry, I'm a little

24   nervous.

25              THE COURT:  Take your time.  And if you'd like me

1    to start the conversation, I'd be happy to.

2              THE DEFENDANT:  Would you, please.

3              THE COURT:  All right.  So what were you thinking?

4              THE DEFENDANT:  Just as what was said, that I

5    wanted to see what was going on with my own eyes.

6              About the leadership part, I definitely did not

7    have any kind of connection to anybody; and with the

8    pointing and everything, I think I was maybe just a little

9    naive.  Excuse me.

10             I guess I was a little naive about the intentions

11   of the people around me.  I guess I sort of thought they

12   would all be a little bit like me so...

13             I am remorseful now, but...

14             Yes, that's all.

15             THE COURT:  So, you know, I listened to your FBI

16   interview.  I read the presentence investigation report.  As

17   Mr. Jones says, you say that you were there just to bear

18   witness, to see with your own eyes what was happening.  You

19   talked about, you know, recording it and leaving after your

20   cellphone died.

21             But I look at the videos and I see more than that,

22   okay?  I see you at the -- I understand that you're not a

23   leader.  You're not a Proud Boy.  You're not an Oath Keeper.

24   You don't know those folks.  I get that.  But I see you

25   telling people where to go.  I see you saying you wanted to

1    find where the electors are.  I see you leading the chants

2    or at least joining in them, pointing people to where you

3    want them to go.  You're at the front of the pack.

4           To me that's not just bearing witness or being a

5    citizen journalist or satisfying, you know, yourself as to

6    what was going on.  That's being more of a participant.

7           Am I reading that wrong?

8           THE DEFENDANT:  No, Your Honor.  All of the

9    material facts I agree with.

10          THE COURT:  And so why were you doing those

11   things?  You know, what motivated you to go in and to

12   participate like you did?

13          THE DEFENDANT:  Honestly --

14          THE COURT:  And more importantly, you know, do you

15   regret having done that?  Honestly.

16          THE DEFENDANT:  Honestly, yes, I do.  It's much

17   easier to judge my own actions in retrospect.

18          I will say I got caught up in the moment a little

19   bit.  I had never been in such a circumstance before, and --

20   I don't know -- I guess my emotions took hold of me more

21   than I would have liked them to.  I wouldn't necessarily say

22   I was controlled and measured because of that, but I can --

23   I can understand how it looks certainly.

24          And if there's a question about if I will ever do

25   that again, the answer is certainly not.  I guess I just

1   didn't realize the impact that my actions were having when I

2   was there.

3            THE COURT:  Ms. Albinson mentioned Ashli Babbitt.

4   She was shot, I believe, at 2:44.  Did you hear the gunshot?

5            THE DEFENDANT:  Your Honor, I'm sorry, your

6   microphone broke up, and I didn't hear what you said.

7            THE COURT:  Ms. Albinson mentioned Ashli Babbitt.

8   Do you know who she is?

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  And she was shot at about 2:44 not too

11  far from where you were standing.  Do you understand that?

12           THE DEFENDANT:  Yes, Your Honor, I do.

13           THE COURT:  Have you thought about, you know, if

14  you would have been in a slightly different place either a

15  little bit before or a little bit afterwards, going through

16  a door that you didn't know what was on the other side of

17  that, that could have been you?

18           THE DEFENDANT:  I have --

19           THE COURT:  Go ahead.

20           THE DEFENDANT:  I have thought about that.  I

21  didn't hear the gunshot myself, and honestly, the thought of

22  true violence like that never crossed my mind at the moment.

23           But in reflection, yes, I definitely have thought

24  about that, and I've talked a lot about that with my

25  parents, yes.

1          THE COURT:  And do you know how many people died

2    on January 6th?

3          THE DEFENDANT:  I don't.  I only knew of

4    Ms. Babbitt.

5          THE COURT:  Four others, either through violence

6    or through heart attacks or other means.

7          Do you know how many Capitol police officers or

8    other law enforcement took their own lives after January 6th

9    because of the trauma that they went through?

10          THE DEFENDANT:  No, Your Honor.

11          THE COURT:  Four.

12          Do you know how many congressional staffers were

13    behind some of those doors that you were passing and

14    pointing people towards cowering, calling their parents,

15    calling their spouses, wondering if someone was going to

16    crash through the door at any minute with a weapon or with

17    their fists?  Have you thought about that?

18          THE DEFENDANT:  Have I thought about it?  Yes, I

19    have thought about it.  I just, at the time -- I don't know.

20    I mean, it's totally out of character for me.  I've never

21    been violent a day in my life, and I certainly had no

22    intentions of anything like that.

23          But yes.  I have thought about that, yes.

24          THE COURT:  Having thought about all those things

25    and hearing the statistics, do you still think it will be a

1   cool story to tell your grand kids 50 years from now?

2          THE DEFENDANT:  No.  That really was just poor

3   humor.  I guess it was a really stressful situation for me

4   being there with the FBI, and it was more like -- excuse

5   me -- it was more like gallows humor for myself.  Obviously

6   I shouldn't have said that, but that totally just came off

7   wrong.

8          THE COURT:  But before you said that, the agent

9   asked you do you regret having been there, and I think your

10  answer was I don't know.  And then you said the joke about

11  telling your grand kids about it.

12         And so -- and I accept -- I listened to your

13  interview.  You're a highly intelligent guy.  You're very

14  thoughtful.  You're very logical.  Your answers were very

15  measured and precise, and I took the last answer as being

16  genuine; that sitting there today on that day you didn't

17  know whether you regretted it or not regardless of whether

18  the joke fell flat or not.

19         THE DEFENDANT:  I understand how it sounds, Your

20  Honor.  I mean, I -- all of the statistics you just read,

21  honestly I didn't know any of those at that time.  I just

22  learned that this morning.  All I had known about was the

23  Ashli Babbitt thing.

24         And, I mean, obviously I knew that the electors

25  must have been scared, but I really didn't understand the

1    gravity of my personal actions and how they, you know,

2    played a role in that at the time.

3              THE COURT:  You majored in philosophy, I

4    understand.

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Any particular type that you studied?

7              THE DEFENDANT:  I really enjoyed existentialism.

8    I also thought that metaphysics was very interesting,

9    although I barely understood it.  I thought if I, you know,

10   spent more time on that I would have gotten that a little

11   better.  But I thought it was interesting, yes.

12             THE COURT:  Did you study ethics and political

13   philosophy?

14             THE DEFENDANT:  I, of course, read some, but that

15   wasn't what I was most interested in, no.

16             THE COURT:  You work for a law firm, I understand.

17             THE DEFENDANT:  Yes, sir.  I started on September

18   3rd doing mostly kind of like mortgage law stuff.

19             THE COURT:  Have you gotten an opportunity to

20   spend a lot of time with the lawyers at your firm?

21             THE DEFENDANT:  No, Your Honor, I haven't.

22             THE COURT:  Okay.  Well, I would encourage you to

23   talk with some of them about the importance of complying

24   with the law and about the rule of law and the role that it

25   plays in our system of government, okay?  And don't just

1    take it from me, but, you know, get to know some of those

2    folks.

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  And you are fortunate to have a job in

5    a law firm frankly, okay.

6              THE DEFENDANT:  I'm very grateful for it, Your

7    Honor.

8              THE COURT:  Okay.  Ms. Field, you may not know

9    the answer to this question, but any idea whether the --

10   where are -- you're in the Western District of North

11   Carolina, Mr. Jones?

12             MR. JONES:  Middle District of North Carolina.

13             THE COURT:  -- whether the Middle District has any

14   experience with intermittent incarceration?

15             MR. JONES:  It does, and I actually reached out

16   this week to the United States Marshals Service here, which

17   is based in Greensboro, and the response was, you know, if

18   the Court orders intermittent confinement to the custody of

19   the marshals, they absolutely can accommodate that.

20             I'll tell the Court, the Middle District has some

21   federal territorial lands with a national park, and so we

22   have misdemeanors that come through on that docket with

23   frequency, and so intermittent confinement on weekends is

24   not a foreign concept or practice to our marshals service.

25             THE COURT:  Okay.  Ms. Albinson, any comments on

1  that?

2          MS. ALBINSON:  Your Honor, I believe Mr. Jones is

3  more familiar with that than I am; I apologize.  I'm not

4  very familiar with that.

5          If you wouldn't mind, could I just clarify the

6  record on the question that Your Honor asked before about

7  supervised release?  I apologize.  I thought that you were

8  asking about a split sentence, which I do believe is

9  authorized for a petty misdemeanor.  So supervised release

10  is not authorized, but a split sentence is.

11          THE COURT:  You're using the term "split sentence"

12  in the sense of incarceration for a period and then home

13  confinement or community detention thereafter?  Is that what

14  you mean by "split sentence"?

15          MS. ALBINSON:  I mean incarceration followed by a

16  period of probation.

17          THE COURT:  Okay.

18          THE PROBATION OFFICER:  Your Honor, if I may just

19  clarify?  With respect to the intermittent confinement,

20  because I believe Your Honor asked if I had any experience

21  with that, I did speak with a U.S. probation officer in the

22  Middle District of North Carolina.  He advised me that they

23  do have intermittent confinement in the district; however,

24  it can be difficult due to available jail space, and since

25  COVID it has been a challenge.

1          He didn't provide any additional information, but

2     I wanted the Court to have that.

3          THE COURT:  Very well.  Thank you.

4          All right.  Mr. Scirica, each one of these cases

5     is different.  Each defendant's role is different.  It's up

6     to the Court to consider all these factors and do what is

7     right, and I tried to do that in this case.

8          Mr. Jones is right.  You have no criminal record.

9     You were not a leader of the January 6th insurrection in any

10    sense.  You didn't break anything.  You didn't assault

11    anyone.  And the Court obviously has taken that into

12    account.

13         By the same token, as I said, I don't think that

14    you were just a passive observer.  You were there to

15    document it to satisfy your own self.  I think once you got

16    there, for whatever reason -- you got caught up in the

17    moment or perhaps you were truly committed to some cause --

18    you know, you did more than that.  I think you fashioned

19    yourself as one of the sheep dogs, one of the ones who is

20    leading the herd in the direction that you think they ought

21    to go.  And for someone as young as you to take a position

22    like that says something about you.  You know, it says that

23    you view yourself as wanting to be, you know, a leader in

24    that sense.

25         And regardless of what you did -- and I've told

1    many other defendants this -- as the government has pointed

2    out, you were part of a bigger and much more dangerous and

3    serious enterprise, whether you realized it then or not.

4    And I think given where you were, given what you saw, given,

5    you know, how smart you are, you know, you should have

6    realized that, okay?  And because of, you know, your

7    education and your smarts and all that I think you should

8    have known better.  All right?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  And you should have not got caught up

11   in it.

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  And we've talked a lot about this in

14   our conversation, which I do appreciate, and I'm just -- I'm

15   going to end it there, and I'm going to impose a sentence

16   consistent with the government's recommendation, but because

17   you are employed, which I would encourage you to continue to

18   do, I will impose a sentence of 15 days -- or 14 days --

19   excuse me, 15 days with credit for the one day that you have

20   served on an intermittent weekend seven-weekend basis.

21             And we will accommodate a report date that is --

22   that makes sense with the Middle District based on COVID and

23   all of the other considerations that they have, okay?  So

24   I'm not ordering an immediate report date.

25             So with that, Mr. Scirica, pursuant to the

1    Sentencing Reform Act of 1984 and in consideration of the

2    provisions of 18 USC 3553, it is the judgment of the Court

3    that you are hereby committed to the custody of the Bureau

4    of Prisons for a term of 15 days incarceration to be served

5    intermittently on weekends.  You're ordered to make

6    restitution to the Architect of the Capitol in the amount of

7    $500.  The Court has determined that you do not have the

8    ability to pay interest and therefore waives any interest or

9    penalties that may accrue on that balance.  Restitution

10   payments shall be made to the Clerk of the Court for the

11   United States District Court for the District of Columbia

12   for disbursement to the Architect of the Capitol, and the

13   address will be in the judgment.

14           You are also ordered to pay a fine in the amount

15   of $500.  The Court has determined that you do not have the

16   ability to pay interest and therefore waives any interest or

17   penalties that may accrue on the balance.

18           You must pay the financial penalty in accordance

19   with the schedule of payments, a sheet that will be listed

20   on the judgment.  You must also notify the Court of any

21   changes in economic circumstances that might affect your

22   ability to pay the financial penalties.

23           Having assessed your ability to pay, payment of

24   the total criminal monetary penalties is due as follows:

25   Payment in equal monthly installments of $200 over a period

1    of five months to commence after the date of this judgment.

2            You have the right to appeal the sentence imposed

3    by the Court if the period of imprisonment is longer than

4    the statutory maximum.  If you choose to appeal, you must

5    file any appeal within 14 days after the Court enters

6    judgment.

7            You also have the right to challenge the

8    conviction entered or sentence imposed if new and currently

9    unavailable information becomes available to you or on a

10   claim that you received ineffective assistance of counsel in

11   entering a plea of guilty to the offense of conviction or in

12   connection with this sentencing.  If you are unable to

13   afford the cost of an appeal, you may request permission

14   from the Court to file an appeal without cost.

15           Any objections for the record?

16           MR. JONES:  No objection.  One potential

17   clarification request that might make it easier for

18   imposition?

19           THE COURT:  Yes.

20           MR. JONES:  I believe the Court can order that he

21   serve it in the custody of the United States Marshals

22   Service, and if he's to be housed in a local jail facility

23   on the weekends, it would be the Marshals Service that would

24   have custody of him.

25           The Court had ordered the BOP, but I think the

1    Court can instead, on the judgment form, indicate custody of

2    the Marshals Service and that would effectuate the

3    intermittent confinement.

4           THE COURT:  Ms. Field, any reaction to that?  I

5    think that's correct.

6           THE PROBATION OFFICER:  I think that's correct,

7    Your Honor.  Our only request is that -- we would ask that

8    the Court order that the defendant start the sentence on a

9    date on or after to allow for designation purposes because I

10   think he would still have to be processed through the BOP,

11   and then the Court could make the recommendation that he

12   serve that through the United States Marshals Service.

13          But we would ask that the Court order that he

14   start the sentence on or after a specific date to allow

15   them -- to allow the BOP time to appropriately designate him

16   on their own process.

17          THE COURT:  All right.  We will research that

18   point.  I do think it makes sense to start the sentence on

19   or after a particular date, and we will research as to

20   whether he will be committed to the custody of the BOP just

21   for placement purposes or whether to submit custody to the

22   Marshals.

23          MR. JONES:  Yes, Your Honor.  And relatedly to

24   that, if the Court concludes that the BOP designates this,

25   we would obviously make a recommendation for a facility as

1    close to his home in North Carolina as possible.

2              THE COURT:  We will include that.

3              Ms. Albinson, anything else?

4              MS. ALBINSON:  No, Your Honor.  Thank you.

5              THE COURT:  All right.  Mr. Scirica, you're a

6    young man.  I always tell defendants that you shouldn't be

7    judged by the worst mistake that you've ever made.  This was

8    a really bad mistake, okay?

9              I don't care what your political views are.  I

10   don't care, you know, what issues you advocate.  That's not

11   why we're here, all right?  You can't break the law in doing

12   that, all right?

13             THE DEFENDANT:  Yes, Your Honor.  Thank you for

14   your time.

15             THE COURT:  Good luck to you, sir.

16             MS. ALBINSON:  Your Honor?

17             THE COURT:  Yes, I'm sorry.

18             MS. ALBINSON:  I need to dismiss Counts 1 through

19   3 of the information pursuant to the plea agreement.

20             THE COURT:  So ordered.

21             All right.  We're adjourned.  We will get out a

22   standard judgment and committal order.

23             MR. JONES:  Yes, Your Honor.  Thank you.

24             MS. ALBINSON:  Thank you, Your Honor.

25             (Whereupon the hearing was adjourned until 4:01 p.m.)

1          THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

2     We are back on the record for Criminal Case 21-457, *United*

3     *States of America vs. Anthony Scirica*.

4          Counsel, please identify yourselves again for the

5     record.

6          MS. ALBINSON:  Grace Albinson for the United

7     States.

8          MR. JONES:  And Mark Jones here in North Carolina

9     with Anthony Scirica.

10          THE COURT:  Okay.  Good afternoon again, everyone.

11     My apologies for bringing everyone back, but following the

12     initial portion of the hearing this morning my crack staff

13     advised me -- and this is why federal judges should not try

14     to improvise -- they reminded me that I am actually not

15     authorized to impose a sentence of intermittent

16     incarceration unless it is a condition of either supervised

17     release or probation.

18          So I could impose -- so, therefore, the sentence I

19     imposed was actually not authorized so I thought it was --

20     that I should bring you all back and reopen the hearing from

21     this morning.

22          I could impose a probationary sentence with

23     intermittent incarceration as a condition of probation, but

24     following the hearing I believe probation consulted with the

25     Eastern District of North Carolina and was advised that it

1    strongly recommends against that approach given COVID and

2    other logistical difficulties.  Is that correct, Ms. Field?

3              THE PROBATION OFFICER:  That's correct, Your

4    Honor.  Just one thing to clarify, it's the Middle District

5    of North Carolina.

6              THE COURT:  So based on that feedback, the Court

7    is prepared to revise its oral sentence and impose the

8    recommended sentence by the government, which is 15 days of

9    straight incarceration with credit for one day of time

10   served and, as previously stated, a $500 fine and $500 in

11   restitution.  Because the oral pronouncement of the sentence

12   trumps the written sentence in the J&C, the Court thought it

13   was appropriate to bring everyone back and revise the oral

14   sentence.

15             Mr. Scirica, I know that this is inconsistent with

16   what the Court said before, and frankly it is inconsistent

17   with the way that I would have liked to have imposed the

18   sentence, but I cannot give an illegal sentence, and I'm not

19   prepared to give a sentence that the district is

20   uncomfortable implementing due to all of the factors in

21   play.

22             So I know that you are working, but I would

23   suggest to your employer that they obviously should

24   accommodate this through leave or vacation time or whatever

25   other accommodations you folks can work out.

1        And, Mr. Jones, you should feel free to convey the

2    Court's sentiment to the employer, if that is going to be an

3    issue.

4        MR. JONES:  I'll certainly do that.  And I don't

5    want to speak out of turn without the Court's permission,

6    but I'll tell the Court, you know, in the interim I also

7    reached out to the Marshals Service about exactly this

8    question, you know, who confirmed again for me that if

9    ordered to their custody for intermittent confinement that

10   it's -- you know, they would do what the Court ordered.

11       And so I think that there is a way to effectuate

12   what the Court originally pronounced because the Court can

13   instruct that the Marshals are the people who are engaging

14   in the conversations with the jail for the purpose of

15   intermittent confinement, and I think that Mr. Scirica could

16   be on a term of probation while that's occurring.

17       I mean, I fully appreciate that, you know, it is

18   usually the Marshals and not the probation who are arranging

19   for that, and so to the extent there's any doubt, you know,

20   a call to the Marshals Service may be more appropriate in

21   finding out how comfortable they are with it than compared

22   to the probation office.

23       THE COURT:  I appreciate that, but I'm going to

24   stick with the sentence so as not to cause any more

25   confusion than has already been caused.  BOP, I understand,

1    has a contract with a local facility there so they will

2    likely not have to do a placement.  We will recommend a

3    placement close, but my understanding is that, you know, the

4    place where he will be may be the same place that the

5    Marshals have some understanding with.  So it will be local,

6    and we will get it out of the way and move forward.  All

7    right?

8              Anything else, Counsel?  Ms. Albinson?

9              MS. ALBINSON:  No, Your Honor.  I apologize that I

10   wasn't on to that issue, but thank you.

11             THE COURT:  You know, we don't do a lot of

12   misdemeanor sentencings in federal court here in D.C. given

13   the nature of our docket and our relationship to the local

14   court system, but I've actually encountered this issue

15   before and so I should have flagged it.  I apologize for

16   that as well.

17             Ms. Field, anything else?

18             THE PROBATION OFFICER:  Your Honor, just that the

19   Court -- if the Court could ask Mr. Scirica to please make

20   himself available by telephone after the hearing so that I

21   may go over the voluntary surrender instructions for him and

22   how he'll be notified of where and when he needs to report.

23             THE COURT:  Mr. Jones, how much does Mr. Scirica

24   need to prepare himself for a self-report?

25             MR. JONES:  May I consult with him, Your Honor?

```
 1                    (Pause)
 2                    THE COURTROOM DEPUTY:  And, Your Honor, one
 3         particular -- one matter, and this is off of Ms. Field's,
 4         are we still imposing the special assessment fee of $10 in
 5         this matter?
 6                    THE COURT:  Yes.
 7                    THE COURTROOM DEPUTY:  Okay.  Thank you.
 8                    MR. JONES:  Your Honor, if the -- after the BOP --
 9         a reporting date within a month should be fine.  That should
10         at least give him the time to attempt to accrue more hours
11         in hopes of saving that job.
12                    THE COURT:  The Court will order a report date
13         after March 1st.
14                    Anything else?
15                    MS. ALBINSON:  No, Your Honor.
16                    THE COURT:  Okay.  We are adjourned.  Good luck to
17         you, Mr. Scirica.
18                    THE PROBATION OFFICER:  Thank you, Your Honor.
19                    MS. ALBINSON:  Thank you.
20                        (Whereupon the hearing was
21                         concluded at 4:09 p.m.)
22
23
24
25
```

1                    <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3                    I, LISA A. MOREIRA, RDR, CRR, do hereby

4      certify that the above and foregoing constitutes a true and

5      accurate transcript of my stenographic notes and is a full,

6      true and complete transcript of the proceedings to the best

7      of my ability.

8        **NOTE:**  This hearing was held remotely by Zoom or some

9      other virtual platform and is subject to the technological

10     limitations of court reporting remotely.

11                    Dated this 26th day of January, 2022.

12

13

                                  <u>/s/Lisa A. Moreira, RDR, CRR</u>
14                                Official Court Reporter
                                  United States Courthouse
15                                Room 6718
                                  333 Constitution Avenue, NW
16                                Washington, DC 20001

17

18

19

20

21

22

23

24

25